**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **(1) RAMINTA WILSON, individually, on behalf of the Saint Francis Health System, Inc. 401(K) Savings Plan, and on behalf of all similarly situated participants and beneficiaries of the plan,** | **CASE NO:** |
| **Plaintiff,** | |
| **v.** | |
| | **JURY TRIAL DEMANDED** |
| **(2) SAINT FRANCIS HEALTH SYSTEM, INC. and (3) SAINT FRANCIS HEALTH SYSTEM RETIREMENT PLANS ADMINISTRATIVE COMMITTEE,** | |
| **Defendants.** | |

**CLASS ACTION COMPLAINT**

## I.    INTRODUCTION

1.      Plaintiff Raminta Wilson ("Plaintiff") individually, and on behalf of all other similarly situated participants, their beneficiaries and estates, and on behalf of Saint Francis Health System, Inc. 401(K) Savings Plan ("the Plan") brings this action under 29 U.S.C. §§ 1132(a)(2) and (3) & 1109(a) against Defendants (1)  Saint Francis Health System, Inc. (the "Company"), and (2) Saint Francis Health System Retirement Plans Administrative Committee (collectively, the "Committee") (collectively, the Company and the Committee will be referred to as "Defendants" or "Fiduciaries"), to remedy Defendants' breaches of fiduciary duties and other violations of the Employee Retirement Income & Security Act of 1974, as amended (ERISA), U.S.C. 29 § 1001, *et seq*.

2.      Defined contribution plans that are qualified as tax-deferred vehicles have become the primary form of retirement savings in the United States and, as a result, America's *de facto*

1

retirement system. Unlike traditional defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk of high fees associated with the investment of pension plan assets, defined contribution plans operate in a manner by which participants bear the risk of high fees.

3.     As fiduciaries of the Plan, at all times relevant to this Complaint, Defendants were obligated to act (1) prudently; and (2) for the exclusive benefit of participants and beneficiaries.

4.     Defendants violated their fiduciary duties by both (1) initially selecting; and (2) consistently retaining higher cost investment options which materially reduced Plan participants' retirement funds as compared to readily available alternatives.

5.     As a result of these breaches in fiduciary duty, Plaintiff and the proposed class lost millions of dollars.

6.     To remedy Defendants' fiduciary breaches, as further described below, Plaintiff brings this action individually and on behalf of the Plan to obtain the relief provided under ERISA § 409, 29 U.S.C. § 1109, for losses suffered by the Plan, from six years prior to the filing of this complaint to the date of judgment (the "Class Period") and for other appropriate equitable and injunctive relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

## II.    JURISDICTION AND VENUE

7.     This Court has exclusive jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA Section 502, 29 U.S.C. § 1132(e)(1).

8.     Venue lies in this district pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because the Company resides in this district (with a principal place of business in Tulsa, OK), and at least one of the alleged breaches took place in this district.

2

### III.    THE PARTIES

#### A.  Plaintiff

9.      Plaintiff Raminta Wilson brings this suit individually, on behalf of the Plan, and on behalf of a class of participants and beneficiaries of the Plan. At all relevant times, and during the Class Period, Plaintiff, by virtue of employment with The Company and participation in the Plan, was a participant as defined by ERISA § 3(7), 29 U.S.C. § 1002(7).

10.      At relevant times during the Class Period, Plaintiff was invested in the retail share class[1] option of the Fidelity Freedom Target Date Fund series, share class ("Fidelity TDF Retail"), provided by Defendants in the Plan.

11.      As a Plan participant and holder of the Fidelity TDF Retail, Plaintiff has standing to bring claims on behalf of the Plan pursuant to 29 U.S.C. §1132(a)(2), seeking appropriate relief under 29 U.S.C. §1109.

12.      Plaintiff has standing to bring claims on behalf of all participants and beneficiaries who invested in the  Fidelity TDF Retail in the Plan because the alleged harms to those participants and beneficiaries can be traced to the same challenged conduct: the imprudent process that Defendants used to select, monitor, and retain the higher cost share classes and otherwise administer the Plan.

13.      As a result of Defendants' mismanagement of the Plan and violations of ERISA, Plaintiff was subject to excessive fees and suffered financial losses.

---

[1] Ticker FFFHX and FFFGX.

**B. Defendants**

14.    The Company is a not-for-profit corporation, with a principal place of business at 6600 S. Yale Avenue, Suite 400, Tulsa, OK 74136. On information and belief, the Company has over 13,000 employees.

15.    The Company is the sponsor of the Plan per ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B); a party in interest under ERISA § 3(14)(C), 29 U.S.C. § 1002(14)(C); and a Plan fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(2)(A), to the extent that it exercised discretion over the administration and management of the Plan and/or control of Plan assets.

16.    At all relevant times, the Company was the Plan administrator under ERISA § 3(16), 29 U.S.C. § 1002(16); a party in interest under ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A); and Plan fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), to the extent that it had or exercised discretion over the administration or management of the Plan and/or control of Plan assets.

17.    At all relevant times, the Committee, as the governing body of the Plan Sponsor and Administrator, were parties-in-interest under ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A), and fiduciaries of the Plan under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), to the extent that they had or exercised discretionary authority respecting the administration or management of the Plan, and/or control of Plan assets.

## IV.    THE PLAN

18.    The Plan is a retirement plan within the meaning of 29 U.S.C. § 1002(2)(A), a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34), and a qualified plan under 26 U.S.C. § 401(k).

4

19.     The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA").

20.     The Plan is a single-employer 401(k) and profit-sharing plan. The Plan covers substantially all employees of the Company and its subsidiaries.  The Company is the Plan sponsor and Administrator.

21.     The Plan qualified as a "Large" or "Mega"[2] plan during all relevant times.  As of the end of 2024, the Plan had $1B in assets and 13,000 total Plan participants

22.     Each mutual fund investment option available under the Plan is offered through a specific share class that has been pre-selected by the Plan's fiduciaries on behalf of participants. Mutual funds typically offer multiple share classes—such as "retail" and "institutional." Mutual fund providers generally seek to attract larger or institutional investors by offering lower-cost share classes compared to those available to individual retail investors.

23.     Retail share classes of mutual funds are designed for small individual investors, while institutional share classes are designed for large and/or institutional investors.  Retail share classes are identical to institutional share class funds in every respect, except for materially higher fees.[3]

24.     The costs may differ among share classes, but the investment product is identical—the managers, investment styles, and stocks are not merely similar, but identical.

---

[2]Defined contribution retirement plans are typically classified as: "Micro" plans (less than $5 million in assets); "Small" plans ($5 million to less than $50 million); "Mid" plans ($50 million to less than $200 million); "Large" plans ($200 million to less than $1 billion); and "Mega" plans (more than $1 billion).

[3] The Department of Labor has stated that "One estimate is that the typical institutional fund has an expense ratio that is 50 basis points lower than comparable retail funds." U.S. Dep't of Labor Pension & Welfare Ben. Admin., Study of 401(k) Plan Fees and Expenses § 2.4.1.3 (Apr. 13, 1998).

25.     At all relevant times, the Plan offered the Fidelity Freedom TDF series as the qualified default investment alternative ("QDIA"); hence, a participant who did not provide direction on investment was automatically invested in the Fidelity TDF. As such, Fidelity TDF Retail comprised over three-quarters of the Plan assets from 2020 through 2024.

### V.    DEFENDANTS' FIDUCIARY OBLIGATIONS

26.     ERISA imposes strict fiduciary duties upon the Defendants as fiduciaries of the Plan, including the duty of prudence. These duties apply to all fiduciary acts, including the Defendants' selection and retention of investment options for the Plan.

27.     ERISA's duty of prudence requires fiduciaries to discharge their responsibilities "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters would use." 29 U.S.C. §1104(a)(1)(B).

28.     As part of its fiduciary duty, Defendants "ha[ve] a continuing duty to monitor [Plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015). "A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id*. at 530. If an investment is imprudent, Defendants "must dispose of it within a reasonable time." *Id*. (citation omitted).

29.     ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty.

30.     In addition, 29 U.S.C. § 1105(a)(2), establishes absolute liability for a fiduciary even if the fiduciary does not have knowledge of the other fiduciary's breach.

Under 29 U.S.C. § 1132(a)(2), a plan participant is authorized to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109.

**A. The Standard of Care for Prudent Fiduciaries Selecting and Retaining a Particular Share Class of a TDF Series**

31. Mutual funds incur operating expenses (including management fees, administrative expenses, recordkeeping and some revenue-sharing arrangements) that are reflected as a percentage of the fund's average net assets, commonly referred to as "expense ratio" ("ER"). These expenses are deducted from the fund's investment returns; hence, the expenses are billed indirectly to the participants, deducted from the Plan assets and reflected in net investment performance.

32. The U.S. Supreme Court explicitly found a plausible breach of the duty of prudence where fiduciaries offer and retain retail-class mutual funds or annuities that carry higher fees than identical institutional-class shares of the same investments, rejecting the notion that the availability of low-cost options elsewhere in the plan excuses the inclusion of higher-cost, imprudent options. *Hughes v. Northwestern University*, 142 S. Ct. 737, 740–41 (2022).

33. Retail share classes (or equivalently high-cost share classes) are often imprudent for larger or institutional investment portfolios where lower cost institutional share classes are available, because they impose unnecessary costs, including inflated ERs that increase participant fees, thereby directly impacting a fund's value and distributions.

34. Investing plan assets in higher share classes harms the Plan's participants not only through higher ERs, but also because it often causes excess indirect fees, which are not tethered to any service value provided to Plan participants but rather are tied to the amounts invested by Plan participants. Even if a plan underperforms, the indirect fees are the same and reduce assets.

35. The erosive effect of daily excessive fees and the resulting lost returns compound over time, substantially lowering the corpus of participants' retirement investments.

36.    Furthermore, because fees are paid every day and credits are credited back several months later, any credits need not only offset the fee difference, but also the fee-drag difference on daily performance.

37.    As stated by the SEC Office of Compliance Inspections and Examinations, a fiduciary investment advisor "has failed to uphold its fiduciary duty when it causes a client to purchase a more expensive share class of a fund when a less expensive class of that fund is available."[4]

38.    In solidarity with that holding, ERISA requires fiduciaries to incur only reasonable expenses, and wasting plan assets violates the duty of prudence.

39.    Further, because most plan fiduciaries designate the selected TDF as the qualified QDIA under ERISA, the TDF and share class selected by a plan fiduciary will typically contain the lion's share of the assets of most plan participants. For this reason, the selection of the TDF share class is one of the most important and impactful fiduciary decisions that must be performed with due diligence for selection and monitoring responsibilities.

## VI.    FACTUAL ALLEGATIONS

### A. Defendants Failed to Follow a Prudent Process When Choosing to Select and Retain Higher Cost Share Classes of Identical Investments.

40.    Here, the Plan fiduciaries wasted Plan assets by failing to (1) conduct a comprehensive review of the available share classes and select a reasonably priced share class of

---

[4] "OCIE's 2016 Share Class Initiative", National Exam Program Risk Alert, Securities and Exchange Commission, Office of Compliance Inspections and Examinations, July 13, 2016, available at  chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.sec.gov/ocie/announcement/ocie-risk-alert-2016-share-class-initiative.pdf (last visited April 13, 2026).

the funds for inclusion in the plan menu; and/or (2) negotiate for a lower cost share class at any point following initial selection of the fund; which (3) caused damage to the Plan.

### 1. *Initial Selection Error*

41.     Prior to 2020, Defendants were invested in Fidelity Freedom TDF series, share class K ("Fidelity TDF K"), then inexplicably switched, and selected Fidelity TDF Retail as an investment option—and the Plan's QDIA—despite the long-standing availability of materially identical, lower-cost share classes with lower expense ratios, such as Fidelity Freedom Class K6 ("Fidelity TDF K6").

42.     Fidelity TDF Retail is the highest cost share class available, even exceeding the Plan's prior QDIA Fidelity TDF K by several basis points.[5]

43.     At all relevant times, Defendants had access to low-cost institutional share classes of mutual funds. They either met the minimum investment requirements for these funds or had the option to negotiate with the investment provider to waive the minimum investment requirements.

44.     In selecting share classes with a higher fee, Defendants demonstrated a lack of prudence when selecting investments. A prudent fiduciary must have viable methodology to determine a prudent selection and should be able to spot suitable share class options for the Plan.

### 2. *Ongoing Monitoring Failure*

45.     Following the imprudent selection, the Fiduciaries continuously *maintained* higher cost share classes when identical lower cost class shares of the same mutual funds were available. With the choice of two virtually identical investments—with the same assets, investment style,

---

[5] According to information pulled from the "Compare Funds" tool on Fidelity.com, using comparison of five different retail and institutional share classes from 2035 and 2040 vintages of the Fidelity Freedom TDF series.

and management—Defendants *chose* year-after-year to keep a more expensive share class for an otherwise identical product.

46.     During the Class Period, the less expensive Fidelity TDF K6 share class was available and easily identifiable to Defendants; all share classes and the related fees were disclosed in Fidelity's annual prospectus. Even a simple, quick review of the funds' prospectuses under consideration, would have uncovered the prudent alternative. That the Fiduciaries did not discover this error and correct it within a reasonable time indicates a lack of prudent process.

47.     The inexpensive K6 share class had *no minimum investment* for retirement plans. Hence, the Company qualified for the better share class at all relevant times.

48.     In their roles as fiduciaries, Defendants knew or should have known about the differences in share classes and that a superior alternative investment was readily available.

49.     Despite having the opportunity and obligation to monitor and leverage their position to negotiate lower-cost share classes, as outlined below the Defendants imprudently chose to offer higher-cost fund share classes as investment options for the Plan.

50.     Despite their ongoing duty to monitor Plan investments (as outlined herein), Defendants failed to select, transition to, or negotiate for the lower-cost share class during most of the Class Period, choosing to wait several years to do so.

51.     Defendants imprudently and continuously caused the Plan and its participants to pay higher fees—exceeding those for which the Plan was eligible—for the *exact same* product they could have purchased with fewer Plan assets.

52.     A prudent monitoring of the Plan investments would have required investigation into the obvious error inherent in selecting a more expensive retail-like share class, rather than a

cheaper institutional share class, and would have obligated Defendants to switch to the cheaper share class promptly.

### 3. *The Harm Resulting from the Share Class Selection and Monitoring Failure*

53.    Defendants' actions were directly erosive to the Plan's growth. Defendants caused Plaintiff and other Plan participants/beneficiaries harm: forcing them to pay higher fees and causing lost yield and returns due to the higher fees *with no added benefit*.

54.    The following chart illustrates the ERs for each vintage[6] of the disputed share class Fidelity TDF Retail as compared to the ERs for each vintage of Fidelity TDF K6 (the comparable institutional class).  In the chart, the share class with a higher fee is highlighted in red, while the share class with a lower fee is highlighted in green.

---

[6] The investment objective of a target date fund series is to provide an asset allocation strategy that changes its asset allocation over time as investors get closer to their expected retirement date. The name of each fund in a target date series typically refers to its target date, which corresponds approximately to the investor's anticipated retirement date. For example, a fund with a name like "Retirement Fund 2040" or "Target 2040" is designed for individuals who intend to retire in or near the year 2040. Target retirement years are often offered in five-year increments. The specific retirement date of a fund in a target date series is often referred to as a "vintage." Unless a participant selects a different vintage, they are automatically placed into a vintage based on their birth year.

| Ticker | Fund Name | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|--------|-----------|------|------|------|------|------|------|
| | **Share Class & Expense Ratio by Year** | | | | | | |
| FFFAX | Fidelity Freedom Retirement | 0.47% | 0.47% | 0.47% | 0.47% | 0.47% | 0.47% |
| FYTKX | Fidelity Freedom Retirement K6 | 0.37% | 0.37% | 0.37% | 0.37% | 0.24% | 0.24% |
| | *Difference* | *0.10%* | *0.10%* | *0.10%* | *0.10%* | *0.23%* | *0.23%* |
| FFFCX | Fidelity Freedom 2010 | 0.52% | 0.51% | 0.50% | 0.49% | 0.48% | 0.48% |
| FOTKX | Fidelity Freedom 2010 K6 | 0.39% | 0.39% | 0.38% | 0.38% | 0.25% | 0.25% |
| | *Difference* | *0.13%* | *0.12%* | *0.12%* | *0.11%* | *0.23%* | *0.23%* |
| FFVFX | Fidelity Freedom 2015 | 0.56% | 0.55% | 0.54% | 0.54% | 0.53% | 0.52% |
| FPTKX | Fidelity Freedom 2015 K6 | 0.41% | 0.41% | 0.40% | 0.40% | 0.27% | 0.26% |
| | *Difference* | *0.15%* | *0.14%* | *0.14%* | *0.14%* | *0.26%* | *0.26%* |
| FFFDX | Fidelity Freedom 2020 | 0.60% | 0.60% | 0.59% | 0.58% | 0.57% | 0.56% |
| FATKX | Fidelity Freedom 2020 K6 | 0.43% | 0.43% | 0.42% | 0.42% | 0.30% | 0.29% |
| | *Difference* | *0.17%* | *0.17%* | *0.17%* | *0.16%* | *0.27%* | *0.27%* |
| FFTWX | Fidelity Freedom 2025 | 0.65% | 0.65% | 0.63% | 0.62% | 0.61% | 0.61% |
| FDTKX | Fidelity Freedom 2025 K6 | 0.45% | 0.45% | 0.44% | 0.44% | 0.34% | 0.33% |
| | *Difference* | *0.20%* | *0.20%* | *0.19%* | *0.18%* | *0.27%* | *0.28%* |
| FFFEX | Fidelity Freedom 2030 | 0.69% | 0.68% | 0.67% | 0.66% | 0.66% | 0.65% |
| FGTKX | Fidelity Freedom 2030 K6 | 0.47% | 0.47% | 0.46% | 0.46% | 0.37% | 0.36% |
| | *Difference* | *0.22%* | *0.21%* | *0.21%* | *0.20%* | *0.29%* | *0.29%* |
| FFTHX | Fidelity Freedom 2035 | 0.73% | 0.72% | 0.72% | 0.71% | 0.70% | 0.69% |
| FWTKX | Fidelity Freedom 2035 K6 | 0.49% | 0.49% | 0.48% | 0.48% | 0.41% | 0.40% |
| | *Difference* | *0.24%* | *0.23%* | *0.24%* | *0.23%* | *0.29%* | *0.29%* |
| FFFFX | Fidelity Freedom 2040 | 0.75% | 0.75% | 0.75% | 0.75% | 0.74% | 0.73% |
| FHTKX | Fidelity Freedom 2040 K6 | 0.50% | 0.50% | 0.50% | 0.50% | 0.44% | 0.45% |
| | *Difference* | *0.25%* | *0.25%* | *0.25%* | *0.25%* | *0.30%* | *0.28%* |
| FFFGX | Fidelity Freedom 2045 | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% |
| FJTKX | Fidelity Freedom 2045 K6 | 0.50% | 0.50% | 0.50% | 0.50% | 0.45% | 0.46% |
| | *Difference* | *0.25%* | *0.25%* | *0.25%* | *0.25%* | *0.30%* | *0.29%* |
| FFFHX | Fidelity Freedom 2050 | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% |
| FZTKX | Fidelity Freedom 2050 K6 | 0.50% | 0.50% | 0.50% | 0.50% | 0.45% | 0.46% |
| | *Difference* | *0.25%* | *0.25%* | *0.25%* | *0.25%* | *0.30%* | *0.29%* |
| FDEEX | Fidelity Freedom 2055 | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% |
| FCTKX | Fidelity Freedom 2055 K6 | 0.50% | 0.50% | 0.50% | 0.50% | 0.45% | 0.46% |
| | *Difference* | *0.25%* | *0.25%* | *0.25%* | *0.25%* | *0.30%* | *0.29%* |
| FDKVX | Fidelity Freedom 2060 | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% |
| FVTKX | Fidelity Freedom 2060 K6 | 0.50% | 0.50% | 0.50% | 0.50% | 0.45% | 0.46% |
| | *Difference* | *0.25%* | *0.25%* | *0.25%* | *0.25%* | *0.30%* | *0.29%* |
| FFSFX | Fidelity Freedom 2065 | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% |
| FFSZX | Fidelity Freedom 2065 K6 | 0.50% | 0.50% | 0.50% | 0.50% | 0.45% | 0.46% |
| | *Difference* | *0.25%* | *0.25%* | *0.25%* | *0.25%* | *0.30%* | *0.29%* |

55.    For each year of the Class Period, and for every vintage, the Fidelity TDF Retail share class had substantially higher expense ratio ("ER") than the ratio for the Fidelity TDF K6.

12

56.    Nearly every vintage of the Fidelity TDF K6 *decreased in cost* by several basis points during the Class Period, whereas every vintage of the Retail class either remained stable or decreased slightly during the Class Period. The difference in cost between K6 and Retail grew throughout the class period.

57.    The fact that Defendants did not switch to Fidelity TDF K6 (or alternatively, any of the other available lower-cost share classes), particularly when Fidelity TDF K6 continued to get cheaper, is a testament to their lack of process in evaluating and selecting/changing share classes.

58.    Defendants failed to correct this selection error within a reasonable time; no insight into their imprudent decision to offer Fidelity TDF Retail for years, instead of the identical, but cheaper, Fidelity TDF K6, or any other comparable, less expensive alternative is apparent. Defendants' failure to monitor and evaluate available share classes reflects Defendants' imprudent or absent processes in evaluating and retaining investment share classes for the Plan.

59.    This share class selection error persisted in the plan for over six years. Such a blatant failure in oversight is indicative of an imprudent process or no process at all in reviewing and monitoring share class selections.

60.    Defendants breached their fiduciary duties by passively allowing participant funds to invest in a share class that cost significantly more than the cheaper available share class, without any additional benefit to participants.

61.    The failure to select lower-cost share classes for the Plan's mutual fund options—share classes that are identical in all respects (portfolio manager, underlying investments, and asset allocation), except for cost—demonstrates that Defendants acted imprudently.

62.    At a minimum, Defendants failed to consider the size and purchasing power of the Plan when selecting share classes and failed to engage in a prudent process for the selection, monitoring, and retention of share classes of mutual funds.

63.    Had Defendants employed a prudent monitoring process, the Plan would have millions more in assets.

**B. The Defendants similarly failed to select reasonably priced alternative funds or cheaper share classes for several additional funds.**

64.    Defendants also failed to investigate, identify issues with, and select better-value available[7] share classes for several additional disputed funds chosen as investment options before or during the Class Period, such as: 1) Fidelity Contrafund retail share class, with an ER of ~0.74%, instead of better available share class "K6," with an ER range of ~0.45% (shown in comparison with both institutional retirement share classes "K" and "K6" in **Table 1**, below); and 2) Dodge & Cox International Stock Fund Class I, with an ER of ~0.62%, instead of better available alternative share class "X" with an ER range of ~0.57% (as shown in **Table 2**, below).

65.    The following charts compare the ERs for each different fund mentioned above. The comparison charts demonstrate the Plan funds' materially higher cost over the comparable share classes.

---

[7] Aside from cost and periodic turnover rates, the funds are identical.

**Table 1**

| | Name | Manager Tenure | Inception Date | Assets (Millions) | Turnover Rates | Minimum Investment | Load (Y/N) | Expense Ratio Net † | Expense Ratio Gross ‡ | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Fidelity® Contrafund® (FCNTX) | 36 years | 05/17/1967 | $157,803.70 | 29% 12/31/2025 | $0 | N | 0.74% | 0.74% | |
| | ** Fidelity® Contrafund® Class K (FCNKX) | 36 years | 05/17/1967 | $157,803.70 | 29% 12/31/2025 | $0 | N | 0.67% | 0.67% | |
| | * Fidelity® Contrafund® K6 (FLCNX) | 9 years | 05/25/2017 | $33,565.28 | 37% 12/31/2025 | $2,500 | N | 0.45% | 0.45% | 8 |

**Table 2**

| Annual Fund Operating Expenses (expenses that you pay each year as a percentage of the value of your investment) | Dodge & Cox International Stock – Class I | Dodge & Cox International Stock – Class X |
|---|---|---|
| Management fees* | 0.60% | 0.55% |
| Distribution and/or service (12b-1) fees | None | None |
| Other expenses (custody, accounting, legal, etc.) | 0.02% | 0.02% |
| Total Annual Fund Operating Expenses | 0.62% | 0.57%** |
| Expense reimbursement | None | 0.05%** |
| Net Expenses | 0.62% | 0.52%** |

\*   Management fees include investment advisory fee expenses of 0.50% for each class; and administrative services fee expenses of 0.10% for the Fund's Class I shares and 0.05% for the Fund's Class X shares. 9

66.    As with Fidelity TDF, Defendants retained the higher-cost selections where identical, less-expensive share classes were available.

67.    At all times during the Class Period, the Plan qualified for the all the above-mentioned alternative share classes, as a large-to-mega 401(k) plan.

68.    All the above-mentioned alternative share classes were introduced prior to or within the Class Period.

---

[8] From Fidelity "Mutual Funds Research: Compare Funds – Management & Fees" Tool (2026).
[9] From Dodge & Cox International Stock Fund Prospectus (2025).

15

69. As outlined herein, Defendants had a continuing duty to monitor investments and remove imprudent ones.

70. Nonetheless, Defendants failed to properly monitor the investments in the Plan and remove the higher-cost share classes, continuing to offer them as a Plan option instead of any of the identical, but lower-priced share classes.

71. As with Fidelity TDF Retail series, Defendants continually chose to overpay for extremely similar or identical products with Participant money, indicating a plain lack of prudent process in evaluating and retaining share classes.

## C. Defendants Disloyally Prioritized Their Own Interests and/or the Interests of Third Parties Over the Participants' Interests

72. Alternatively, or concurrently with the lack of prudent process, Defendants' share class selections for the Plan were not only imprudent, but also benefited Defendants and third parties, which requires the inference of disloyalty.

73. Across the Plan, Defendants agreed to revenue-sharing arrangements that allowed Defendants to avoid spending time on paying for necessary administrative services at an increased cost to the participants. This trade-off is neither prudent nor loyal.

74. On their annual 5500 form, Defendants disclose that they make payments based on basis points of the investment back to service providers like Fidelity. These agreements are highly profitable for service providers, as they receive a percentage of the participants' total investments, plus their biweekly wage savings and matching contributions, which greatly surpass what they would have earned from charging each participant a flat quarterly fee that never increases.

75. However, this scheme increases the costs for participants and reduces their funds available for investment. This is true because revenue sharing is tied to higher-cost share classes and funds. More money is paid in fees, reducing the amount invested.

16

76.    This type of agreement benefits everyone **except** the participants: (1) the employer gets to spend less time and money on plan expenses, as they are automatically withheld and shuffled from provider to provider, and (2) the providers gain a windfall they could not make charging a reasonable fee per participant, all while (3) participants are burdened with higher fees and fewer dollars available for investment.  Even if the revenue-sharing credits were passed through to participants (which is arguably not the case), such "rebates" would not make up for the money lost due to growth, time in the market, and higher investment costs.

77.    In essence, Defendants' actions here suggest that Defendants chose to prioritize the bottom line of the Company and the third-party providers rather than participants.

78.    But Defendants' duty of loyalty required them to act in the exclusive interest of the participants **and to defray expenses**.  By failing to do so, Defendants breached their duty of loyalty.

79.    At a minimum, Defendants' actions here raise the inferences of self-dealing, disloyalty, and failure to defray expenses.

80.    This is true not only for the Fidelity TDF Retail series in the Plan; Defendants' imprudent decisions to retain plan-wide higher-cost share classes where identical, cheaper institutional classes were available materially diminished Plan assets and benefited Defendants and third-party service providers.

81.    The prevalence of such agreements in this Plan speaks volumes about where Defendants' loyalties truly lie. Defendants consistently prioritize their own interests and those of the interested third-party service providers over those of the Plan participants. Whether intentionally or unintentionally, such failure of fiduciary loyalty and prudence operate adversely to the stated goals of ERISA.

82.     As a result, the Plan lost  million dollars plan-wide from unnecessary costs incurred from the identified share classes alone during the limited Class Period.

## CLASS ALLEGATIONS

83.     29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. §1109(a).

84.     As an alternative to direct individual actions on behalf of the Plan, Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan.

85.     Plaintiff brings this action on behalf of himself and the Class, which is defined as: participants in and beneficiaries of the Plan but excluding Defendants; any person who was or is an officer, director, employee, or a shareholder of 5% or more of the equity of or is or was a partner, officer, director, or controlling person of, the spouse or children of any individual who is an officer, director or owner of 5% or more of the equity of; Plaintiffs' counsel; judges of the Court in which this case is pending and their current spouse and children; and the legal representatives, heirs, successors and assigns of any such excluded person.

86.     The members of the Class are so numerous, consisting of thousands of members, not including their spouse beneficiaries, who, upon information and belief, are sufficiently dispersed geographically such that joinder of all members is impracticable. The issues of liability are common to all members of the Class and are capable of common answers as those issues.

87.     Plaintiff's claims are typical of the claims of other members of the Class because the claims arise from the same events, practices and/or courses of conduct described above.

88.     Plaintiff's claims are also typical of the claims of other members of the Class because the relief sought consists of requiring Defendants to make the Plan whole for any losses caused by their fiduciary breaches and to disgorge their profits to the Plan. Any such recovery

from Defendants will be paid to the Plan and any relief will flow to all Class Members through their accounts in the Plan.

89.    Plaintiff will fairly and adequately represent and protect the interests of the Class.

90.    Plaintiff does not have any interests antagonistic to or in conflict with those of the Class.

91.    Defendants have no unique defenses against Plaintiffs that would interfere with Plaintiffs' representation of the Class.

92.    Plaintiff is represented by counsel experienced in prosecuting ERISA class actions and with experience and expertise in litigation involving ERISA breaches of fiduciary duty and ERISA prohibited transactions.

93.    The requirements of Fed. R. Civ. P. 23(b)(1)(A) are satisfied. Fiduciaries of ERISA-covered plans have a legal obligation to act consistently with respect to all similarly situated participants and to act in the best interests of the Plan and its participants. This action challenges whether Defendants acted consistently with their obligations under ERISA as to the Plan as a whole. As a result, prosecution of separate actions by individual members would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct relating to the Plan.

94.    The requirements of Fed. R. Civ. P. 23(b)(1)(B) are also satisfied. Administration of an ERISA-covered plan requires that all similarly situated participants be treated the same. Resolving whether Defendants engaged in imprudence with respect to the Plan and fulfilled their fiduciary obligations to the Plan would, as a practical matter, be dispositive of the interests of the other participants in the Plan even if they are not parties to this litigation and would substantially

impair or impede their ability to protect their interests if they are not made parties to this litigation by being included in the Class.

95.    The requirements of Fed. R. Civ. P. 23(b)(2) are satisfied as to the Class because Defendants have acted and/or failed to act on grounds generally applicable to the Class, making declaratory and injunctive relief appropriate with respect to the Class as a whole. This action challenges whether Defendants engaged in breaches of fiduciary duties which would be violations of ERISA as to the Plan as a whole and as to the Class as a whole. The relief sought in this case primarily consists of declarations that Defendants breached their fiduciary duties. As ERISA is based on trust law, any monetary relief consists of equitable monetary relief that would either flow directly by the declaratory or injunctive relief or flows as a necessary consequence of that relief.

96.    The requirements of Fed. R. Civ. P. 23(b)(3) are also satisfied. The common questions of law and fact concern whether Defendants breached their fiduciary duties to the Plan. As the members of the Class were participants in that Plan, their accounts were affected by those breaches and violations. Common questions related to liability will necessarily predominate over any individual questions precisely because Defendants' duties and obligations were uniform to all participants and therefore all members of the Class. As relief and any recovery will be on behalf of the Plan, common questions as to remedies will likewise predominate over any individual issues.

97.    A class action is a superior method to other available methods for the fair and efficient adjudication of this action. As the claims generally are brought on behalf of the Plan, resolution of the issues in this litigation will be efficiently resolved in a single proceeding rather than multiple proceedings, and each of those individual proceedings could seek recovery for the entire Plan. Class certification is a superior method of proceeding because it will obviate the need

for unduly duplicative litigation, which might result in inconsistent judgments about Defendants' duties to the Plan.

98.     The following factors set forth in Rule 23(b)(3) also support certification: a) The members of the Class have an interest in a unitary adjudication of the issues presented here for the reasons that this case should be certified under Rule 23(b)(1); b) No other litigation concerning this controversy has been filed by any other members of the Class; c) This District is the most desirable location for concentrating this litigation because: (i) the Company does business in this District; and (ii) a significant number of Class members are located in this District; d) There are no anticipated difficulties in managing this case as a class action.

99.     Additionally, or in the alternative, this action may be certified as to particular issues under Rule 23(c)(4), including but not limited to Defendants' liability to the Class for their allegedly imprudent and disloyal conduct.

### TIMELINESS

100.    Within the six-year period prior to Plaintiff filing this suit, Defendants violated one or more of their fiduciary obligations as described above.

101.    At all relevant times during the Class Period, Defendants intentionally concealed their fiduciary breaches to prevent Plan participants from discovering them and avoiding the need to cure the deficiencies.

102.    Plaintiff did not acquire actual knowledge of these violations until shortly before commencing this action.

103.    Consequently, Plaintiff's claims in this action are timely under 29 U.S.C. § 1113.

### COUNT I: Breach of Fiduciary Duty of Prudence
### (against all Defendants)

104. Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

105. At all relevant times, Defendants were named and/or *de facto* fiduciaries of the Plan within the meaning of ERISA insofar as they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

106. ERISA mandates that fiduciaries act with prudence in the disposition of Plan assets and selection and monitoring of investments, as well as in the monitoring and minimization of administrative expenses. 29 U.S.C. § 1104(a)(1)(B).

107. As fiduciaries of the Plan, Defendants were subject to the duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the Plan's fees and assets for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aim.

108. At all relevant times during the Class Period, Defendants breached their fiduciary duty of prudence in multiple respects as discussed above.

109. Based on reasonable inferences from the facts set forth in this Complaint, at all relevant times during Class Period, Defendants failed to have a proper system of review in place to ensure, among other things, that: (a) their selection and retention of investment share classes were prudent; and (b) plan expenses were reasonable and necessary.

110. At all relevant times during the Class Period, Defendants did not have adequate procedures in place to monitor investments and did not act in the best interests of the Plan

participants. As a direct and proximate result of these breaches of fiduciary duties, the Plan and its participants suffered at least a million dollars in losses. Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more funds available to them for their retirement.

111.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties and must restore any profits resulting from such breaches.

112.    In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in the Prayer for Relief.

**COUNT II: Breach of the Fiduciary Duty of Loyalty**
**(against all Defendants)**

113.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

114.    At all relevant times, Defendants were named and/or *de facto* fiduciaries of the Plan within the meaning of ERISA insofar that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

115.    ERISA fiduciaries owe a duty of loyalty. 29 U.S.C. § 1104(a)(1)(A). The duty of loyalty requires fiduciaries to act "for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan." *Id*.

116.    The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display…complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id*. at 224 (quotation marks and citations omitted).

117. "Thus, in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income. A decision to make an investment may not be influenced by non-economic factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." U.S. Dep't of Labor ERISA Adv. Op. 88-16A (Dec. 19, 1988).

118. At all relevant times during the Class Period, Defendants breached their fiduciary duty of loyalty in multiple respects as described above by consistently choosing worse investment share classes for the Plan participants in exchange for revenue share benefits for Defendants and third parties.

119. Defendants failed to only act with the exclusive purpose of providing benefits to participants by allowing fee drag, float, unnecessary costs, and excessive costs diminish Plan participants retirement funds.

120. Defendants failed to defray expenses by allowing higher cost share classes, unnecessary costs, and excessive costs diminish Plan participants retirement funds.

121. Defendants failed to act with the exclusive purpose of providing benefits to participants by choosing economically unfavorable options in exchange for revenue share benefits that benefited Defendants and third parties at the expense of the participants.

122. As a direct and proximate result of Defendants' breaches of this fiduciary duty, the Plan and its participants suffered at least a million dollars in losses. Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

123.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by its breaches of fiduciary duties and must restore any profits resulting from such breaches.

124.    In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in the Prayer for Relief.

### COUNT III: Breach of Co-Fiduciary Duties
### (against all Defendants)

125.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

126.    ERISA § 405, 29 U.S.C. § 1105, makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary unless he makes reasonable efforts under the circumstances to remedy the breach.

127.    In addition, 29 U.S.C. § 1105(a)(2), establishes absolute liability for a fiduciary even if the fiduciary does not have knowledge of the other fiduciary's breach.

128.    Each Defendant had the data and information available to them to discover or stop the fiduciary breaches alleged herein.

129.    Each Defendant knew and had the necessary data and information available to them to know of opportunities for better performing investments.

130.    Nevertheless, each Defendant chose to ignore, acquiesce, or participate in the ongoing breaches of fiduciary duty.

131.    Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims, and request that the Court order or award the following relief:

A.  Find and adjudge that the Defendants have breached their fiduciary duties, as described above;

B.  Find and adjudge that the Defendants are personally liable to make good to the Plan the losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

C.  Certify this action as a class action pursuant to Fed. R. Civ. P. 23, appoint the Plaintiff as class representative, and appoint the law firm of Milberg, PLLC as class counsel;

D.  Order Defendants to disgorge any profits they received as a result of the above breaches of fiduciary duty;

E.  Impose a constructive trust over these profits;

F.  Order the Defendants to make good to the Plan the losses resulting from each breach of fiduciary duty and to restore to the Plan any profits resulting from each breach of fiduciary duty;

G. Impose surcharge against the Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive, and/or in violation of ERISA

H. Apportion all amounts recovered for the Plan among the Plaintiffs and the Class;

I. Order that any amount to be paid to the Plan and/or accounts of Plaintiff and Class members can be satisfied by using or transferring any breaching fiduciary's account (or the proceeds of that account) to the extent of that fiduciary's liability;

J. Require Defendants to pay attorneys' fees and the costs of this action pursuant to ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1), or order the payment of reasonable fees and expenses to Plaintiff's counsel on the basis of the common benefit or common fund doctrine (or other applicable law) out of any money or benefit recovered for the Class in this action;

K. Award pre-judgment and post-judgment interest; and

L. Award any other such relief the Court determines Plaintiff and the Class are entitled to pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a).

Dated: April 13, 2026                    Respectfully submitted,

                                         */s/ William B. Federman*
                                         William B. Federman (OBA #2853)
                                         Alex J. Ephraim (OBA #34959)
                                         FEDERMAN & SHERWOOD
                                         10205 N. Pennsylvania Avenue
                                         Oklahoma City, OK 73120
                                         Telephone: (405) 235-1560
                                         Facsimile: (405) 239-2112
                                         wbf@federmanlaw.com
                                         aje@federmanlaw.com

27

Abigail M. Cody\*
**MILBERG, PLLC**
800 S. Gay St., Suite 1100
Knoxville, TN 37929
Tel: (865) 247-0080
acody@milberg.com

*\*Pro Hac Vice Application forthcoming*

*Counsel for Plaintiffs, the Plan, and
the Prospective Class*